IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Otis E. Weatherford,<br><br>                    Plaintiff,<br><br>    vs.<br><br>Carolyn W. Colvin, Acting<br>Commissioner of Social Security,[1]<br><br>                    Defendant. | Civil Action No. 6:13-1885-RMG-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

The plaintiff brought this action pursuant to Section 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for supplemental security income benefits under Title XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for supplemental security income ("SSI") benefits on March 29, 2010, alleging that he became unable to work on July 6, 2001. The application was denied initially and on reconsideration by the Social Security Administration. On December 27, 2010, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Mary L. Cornelius, an impartial vocational expert

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

appeared on November 2, 2011, considered the case *de novo*, and on December 2, 2011, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on May 10, 2013. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1) Claimant has not engaged in substantial gainful activity since March 29, 2010, the application date (20 C.F.R. § 416.971 *et seq*.).
>
> (2) Claimant has the following severe impairments: low IQ with high adaptive functioning; functional illiteracy; alcohol dependence, in very early remission; history of multiple bilateral foot fractures; and chronic low back pain (20 C.F.R. § 416.920(c)).
>
> (3) Claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 416.920(d), 416.925 and 416.926).
>
> (4) After careful consideration of the entire record, I find that claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 416.967 with some additional limitations. Specifically, claimant can lift up to 10 pounds occasionally and lesser amounts frequently. He cannot stand more than an aggregate of 2 hours in an 8-hour day. Claimant can perform no more than occasional stooping, twisting, crouching, kneeling, crawling, balancing, and climbing of stairs and ramps. He is restricted from climbing ropes or scaffolds. He cannot use his right foot for foot pedals or other controls. Claimant is limited to reading at a 2nd grade level, spelling at a 2.1 grade level, and performing math at a 1.9 grade level, but is able to count change, make change, and ensure that he gets the correct change when he shops.
>
> (5) Claimant is unable to perform any past relevant work (20 C.F.R. § 416.965).

(6) Claimant was born on January 16, 1964, and was 46 years old, which is defined as a younger individual age 45-49, on the date the application was filed (20 C.F.R. § 416.963).

(7) Claimant has a limited education and is able to communicate in English (20 C.F.R. § 416.964).

(8) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(9) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. § 416.969 and 416.969(a)).

(10) Claimant has not been under a disability, as defined in the Social Security Act, since March 29, 2010, the date the application was filed (20 C.F.R. § 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of

five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith*

4

*v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff injured both feet when he fell from a ladder while working as a painter in 2001 (Tr. 197, 236).  On September 13, 2004, the plaintiff was seen by Alfred Dawson, M.D., at Florence Orthopaedic Associates, P.A.  A history taken at that appointment noted open reduction with internal fixation of the right ankle with application of external fixator.  The doctor also noted a left calcaneal foot fracture.  The plaintiff described falling in the shower with the onset of back pain.  An examination by Dr. Dawson noted no definite motion of the right ankle and left ankle dorsiflexion of 15 degrees and plantar flexion of 30 degrees.  He noted the right ankle did not move when testing reflexes. Pain was noted with hip rotation on the right while sitting.  There was prominence of the thoracolumbar musculature consistent with mild scoliosis. Dr. Dawson noted that when the plaintiff walks, he turns the right foot out due to the equinus deformity.  Dr. Dawson noted that the plaintiff was a candidate for right ankle fusion and recommended an MRI of the

lumbar spine. He noted that it was not unusual for a person walking with a limp to aggravate underlying problems with the low back (Tr. 257-59).

On April 20, 2005, the plaintiff was seen by Jerry Schexnayder, M.D., with Strand Regional Specialty Associates. The same history given to Dr. Dawson was noted in this report. The plaintiff presented to Dr. Schexnayder for treatment of his bilateral ankle pain. He reported significant stiffness of the right ankle and, to a lesser extent, on the left. An examination of the right lower extremity noted that there was approximately negative 10 degrees of dorsiflexion and limited eversion and inversion of the foot. On the left lower extremity, there was marked limitation of inversion and eversion and dorsiflexion in the ankle to about 10 degrees, and plantar flexion was about 30 degrees. Sensation was diminished to light touch in the plantar aspect of the right foot. Dr. Schexnayder noted post traumatic arthritis in the right tibular joint and post traumatic arthritis in the left subtalar joint. He prescribed Voltaren and recommended a pain management consultation. He noted fusion of the right ankle as an option; though with a possibility of reflex sympathetic dystrophy ("RSD"), he would not recommend it at this time (Tr. 260-61).

On May 12, 2005, the plaintiff was seen by John J. Kirkland, M.D., for a consultative examination at the request of the Commissioner. Dr. Kirkland noted a history of injury to the plaintiff's back and feet when he fell approximately 30 feet off a ladder. The plaintiff complained of pain in both feet and that nothing relieved the pain. The plaintiff also noted history of a cracked vertebrae in his back at L4-L5 and was told by the doctors in the emergency room that the injury was aggravated by a later fall in the shower. Examination of the plaintiff revealed tenderness in the right ankle with quite a bit of deformity. The right foot was in a fixed position with no flexion of extension. Dr. Kirkland also noted that the plaintiff used a cane. He noted the plaintiff complained of marked tenderness in the lumbosacral region leaning over to the right hip and down the right leg. Strength in the right lower extremity was decreased (Tr. 244-45).

On April 16, 2010, the plaintiff's sister told a Social Security Administration District Office employee that the plaintiff read and wrote poorly, but did not mention special education or any mental issues (Tr. 236).

On May 12, 2010, the plaintiff had an MRI taken of his lumbar spine at Florence MRI & Imaging. The MRI revealed mild lumbar spondylosis. X-rays taken of his right ankle revealed a chronic fracture deformity of the distal tibia and talus with post traumatic arthritic change in the ankle. It also revealed a cortical screw running through the distal tibia. X-rays of the right foot taken on the same day revealed mild arthritic change in the great toe, a chronic fracture deformity of the talus, and arthritic change in the distotabular joint space (Tr. 238-43).

On June 1, 2010, State agency consultant Joyce Broadus-Lewis, M.D., opined that the plaintiff could perform sedentary work with additional limitations on pushing, pulling, and various postural activities, based on submitted x-rays of the plaintiff's lumbar spine and right ankle (Tr. 246-51). On reconsideration, the plaintiff added allegations of back pain due to a pinched nerve (Tr. 254). On October 12, 2010, State agency consultant Elva Stinson, M.D., affirmed the prior rating of the plaintiff's functional abilities (Tr. 254).

On October 26, 2011, the plaintiff submitted his education records. These records indicate incomplete grades for tenth grade and confirmed that he withdrew from school on October 22, 1980. An IQ exam administered when he was 11 years old revealed a "total IQ" of 69, which was categorized as "educable" (Tr. 227-32).

On October 27, 2011, the plaintiff underwent a consultative examination with Dan H. Allen, Ph.D. The plaintiff reported to Dr. Allen that he never really learned to read and left school in the tenth grade when he was 16 years old. The plaintiff told Dr. Allen that he was always in "special classes." The plaintiff was married at age 18 and had two children. This marriage ended in divorce after 13 years. Six months after his divorce, the plaintiff remarried. He has been separated from his second wife since 1999. The plaintiff

also reported that he had been a house painter from age 12 through 2001. The plaintiff stated that he used to drink a 12 pack a day several times a week, but that he had "slacked off now," which he defined as drinking a 12 pack over a month's time. Dr. Allen reported that the plaintiff made good eye contact, demonstrated limited vocabulary, and listened intently. The plaintiff was able to give the current month and year, name the President, and identify the capital of South Carolina. Dr. Allen stated that the plaintiff demonstrated mildly deficient intellectual capacity and limited short-term auditory memory. His thought processes were concrete, which made it difficult for him to transfer learning from one situation to another. He assessed a verbal comprehension score of 63, a perceptual reading IQ of 73, and a processing speed of 68. Dr. Allen noted that when the plaintiff reflected upon his life, he stated that there have been times when he was homeless, and this was shared with some embarrassment. He had a current girlfriend and had gone to live with her in Greensboro but found that he "just had a hard time living in a large city." Dr. Allen concluded that his assessed cognitive capacity was in the mildly deficient range. He concluded that these results were valid given the plaintiff's good effort and also the consistency with report of educational work history. Dr. Allen opined that the plaintiff would be able to follow one-step instructions but that his production would likely be slow and erratic (Tr. 263-66).

***Administrative Hearing Testimony***

On November 2, 2011, the plaintiff testified before the ALJ that he was separated from his wife and lived with his mother-in-law, his stepdaughter ,and her husband in Florence, South Carolina (Tr. 39). He testified that he had stopped school in tenth grade, had been in special education classes from kindergarten through the ninth grade, and could not read at all. His ability to read is unchanged from his ability when he attended school (Tr. 40-41).

The plaintiff stated that he had never had a driver's license, but that his family drove him to the grocery store. He stated that he could dress and bathe himself, as well as use the bathroom and prepare meals. The plaintiff testified that he was able to shop, handle money and change, and fold his own clothes (Tr. 42-43). He does not wash his clothes, mop, sweep, vacuum, wash or dry dishes, take trash to the garbage, or clean bathrooms. He does not do any work outside of the home (Tr. 43-44).

The plaintiff testified that he had been an interior and exterior house painter until he fell off a ladder in 2001 sustaining injuries to his feet and lower back (Tr. 45-46).

The plaintiff returned to work for about a month after filing his application for SSI benefits. He estimated that he worked approximately 30 hours during that month and that his duties consisted primarily of "standing around to sweep a house out." The owner of the business terminated his employment. He has inquired about other jobs but was told that he cannot be hired because of his feet (Tr. 46-47). The plaintiff testified that he was told after his fall that he had shattered his right foot in 67 places. He also indicated that his left foot and his left ankle and heel were shattered and that the roof he fell from was approximately 30 feet high. The plaintiff was confined to a wheelchair for approximately one year. He has not had any medical treatment since 2005 due to an inability to find a job and no money to pay for medical bills or to obtain pain medicine (Tr. 48-49).

The plaintiff settled his worker's compensation claim but only received $18,000.00 after child support, attorney fees and costs, and hospital bills were deducted. He attempted to obtain an appointment at Hope Health but was advised that he would have to bring $50.00 for the visit (Tr. 50-51). He also went to the hospital approximately six months before the hearing because his feet and back were hurting but was told they could not assist because he had chronic pain (Tr. 51).

The plaintiff also testified that his feet burned and that he also had a cold sensation. He described the sensation where something hot is sticking to his foot. He also

9

testified that he has been using a cane since 2002 when he first got out of a wheelchair. He is never able to walk without the cane. On an average day, he would rate the pain in his feet between five and six. He can walk probably ten minutes before he has to sit down because they start hurting (Tr. 51-52). He testified he could stand for 15 minutes at a time (Tr. 53). His left foot feels worse than his right foot.

The plaintiff rated his back pain as a three to four on the same one to ten pain scale (Tr. 52). He stated that sitting aggravates his back and his feet and that he could probably sit for 30-40 minutes before he would have to start moving around (Tr. p. 54). He testified that he would need 30-40 minutes before he could start sitting again. He has difficulty sleeping and he has to sleep with his feet about a foot off the bed because his right foot does not bend (Tr. 55). He does not have any medicine to take for his pain. To relieve the pain, he walks around and takes a bath every night in hot water. He is unable to stoop down, and if he has to pick up something off the floor he has to get on his knees to pick it up and then stand back up. He also has difficulties with bending. The maximum amount of weight he can lift is a container of bleach or a trash bag out of the container that he estimates weighs between five and ten pounds (Tr. 56-57). The plaintiff usually assists with grocery shopping once a week for approximately one hour. He pushes the buggy when he goes grocery shopping. After finishing grocery shopping, he feels tired and his feet hurt (Tr. 57). He testified that his pain level goes up to a seven when standing and walking at the grocery store.

While he never has had a driver's license, he was able to obtain a driver's permit by taking an oral test. He never obtained his driver's license due to working out of state during the early part of his career (Tr. 58).

The plaintiff further testified that his condition has been basically unchanged over the last five to eight years (Tr. 59). The last physician that he saw in 2005 or 2006 prescribed Voltaren, but he was unable to take it due to nausea and an upset stomach (Tr.

60). He testified he smokes between five and six cigarettes per day and that his mother-in-law purchases them for him. He does drink alcoholic beverages but does not use illegal drugs (Tr. 62). His only activities during the day are sitting around the house, watching television, and playing with his dog. He watches approximately two hours of television per day (Tr. 63). He testified that alcohol used to be a factor for him in the past, and he used to drink a 12 pack of beer per day (Tr. 68). He indicated that he has cut back his alcohol in the last two to three years because he is not allowed to drink where he is, so he has "just about quit it." Upon questioning by the ALJ, he testified that he drinks a 12 pack a month now. He also admitted that he had just begun staying with his mother-in-law approximately one week before the hearing after having been staying with is sister. He testified that his sister "put me on the road" because of his drinking (Tr. 67). He testified that while was staying with his sister he was drinking probably a 12 pack every other day (Tr. 68). He testified that he experiences shaking sensations and is probably going through alcoholic withdrawal.

  At the hearing, the vocational expert described the plaintiff's past relevant work as a construction or commercial painter, DOT number 840.381-010, described as medium skilled work with an SVP of seven. That was the only job the plaintiff had performed in the last 15 years. In response to the ALJ's first hypothetical, the vocational expert testified that the plaintiff could not perform his past relevant work as a painter but identified the following jobs as consistent with the ALJ's first hypothetical: (1) surveillance monitor, DOT number 379.367-010, sedentary, unskilled with an SVP of two; (2) addresser, DOT number 209.587-010, sedentary, unskilled with an SVP of two; (3) information clerk, DOT number 237.367-010, sedentary, unskilled with an SVP of two (Tr. 65-66).

  Next, the ALJ, added additional restrictions to the first hypothetical given to the vocational expert. The ALJ added a restriction that if the hypothetical claimant was

11

limited to reading only at the second grade level and math at less than a second grade level but is able to count and make change. In response to this second hypothetical, the vocational expert testified that the additional limitations would eliminate all the three previous jobs identified in response to the first hypothetical. The vocational expert then identified jobs that were consistent with the second hypothetical, to include: (1) water breaker semi-conductor, *Dictionary of Occupational Titles* ("*DOT*") number 726.687-030, sedentary unskilled with an SVP of two; (2) suture gauger, *DOT* number 712.687-018, sedentary unskilled with an SVP of two; and (3) stem mounter, *DOT* number 725.684.018, sedentary, unskilled with an SVP of two (Tr. 71).

Upon cross examination by the plaintiff's attorney, the vocational expert testified that all three positions identified in response to the second hypothetical had reading level requirements under or at the second grade level. The vocational expert testified that this is noted in the *DOT* and the *Selected Characteristics of Occupations*. The vocational expert also indicated that the math level for the three positions identified was at the second grade level or less (Tr. 71). The plaintiff's attorney asked the vocational expert a hypothetical to assume the same age, educational background, and work experience as the plaintiff but with additional limitations of only being able to sit for 30-40 minutes and to only stand or walk no longer than 20 minutes at a time. In response to this hypothetical, the vocational expert testified that this would eliminate all the positions that she identified in response to the ALJ's hypothetical questions.

## **ANALYSIS**

The plaintiff was 37 years old on his alleged disability onset date (July 6, 2001) and was 47 years old on the date the ALJ issued his decision. He was in special education classes from kindergarten through ninth grade and stopped attending school in

tenth grade. The plaintiff argues that the ALJ erred by finding that he did not meet Listing 12.05(C).[3]

> Listing 12.05 provides in pertinent part:
>
> *Intellectual Disability*: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> \*\*\*
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>
> \*\*\*

20 C.F.R. pt. 404, subpt. P, app. 1 § 12.05.

As set forth above, to meet the diagnostic description or "capsule definition" of intellectual disability, an individual must have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period [i.e., onset before age 22]." *Id*. This has been described by the Fourth Circuit Court of Appeals as "Prong 1" of Listing 12.05(C). *See Hancock v. Astrue*, 667 F.3d 470, 473 (4th Cir. 2012). " '[A]daptive functioning' refers to the individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of his/her same age. . . ." POMS § DI 24515.056(D)(2), https://secure.ssa.gov/apps10/poms.nsf/lnx/0424515056. Next, the Listing requires a claimant to satisfy one of four additional requirements, categorized in the Listing as

---

[3]On August 1, 2013, while this case was pending, the Social Security Administration amended Listing 12.05 by replacing the words "mental retardation" with "intellectual disability." *See* 78 Fed.Reg. 46,499, 46,501 (codified at 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.05).

Requirements A–D. Here, as in *Hancock*, Requirement C is at issue, requiring an IQ score of 60–70, which the Fourth Circuit describes as "Prong 2," as well as a "physical or mental impairment imposing an additional and significant work-related limitation of function," identified as "Prong 3." *Hancock*, 667 F.3d at 473.

Here, no one disputes that the plaintiff meets Prongs 2 and 3 of Listing 12.05(C). Rather, this appeal centers on the requisite criteria in the introductory paragraph - Prong 1 - requiring ""significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested" before the age of 22. 20 C.F.R. pt. 404, subpt. P, app. 1 §12.05(C). The ALJ explained that, although the record contained evidence that the plaintiff had a full scale IQ score within the required range as well as severe physical impairments, he did not meet Listing 12.05(C) because he had not demonstrated that he had deficits in adaptive functioning (Tr. 17, 20-21). Deficits in adaptive functioning include limitations in "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Jackson v. Astrue*, 467 F. App'x 214, 218 (4th Cir. 2012) (citing *Atkins v. Virginia*, 536 U.S. 304, 308 n.3 (2002)). The plaintiff argues (pl. brief at pp. 13-14) that because the ALJ did not find that he demonstrated all the abilities the Fourth Circuit cited in *Hancock*, substantial evidence does not support the ALJ's finding. Specifically, the plaintiff notes that he does not pay any bills, care for any children, or attend school, as the plaintiff in *Hancock* did. *See Hancock*, 667 F.3d at 476. However, as argued by the Commissioner, this argument is unpersuasive. The court in *Hancock* did not hold that any of the evidence it cited was necessary or dispositive to a finding of a lack of deficits in adaptive functioning; rather, the court found that evidence that the plaintiff had worked several jobs and was able to shop, pay bills, make change, care for her grandchildren, cook, attend school to obtain a GED, and do puzzles constituted substantial evidence to support the ALJ's finding in that case. *Id.*

14

The record here likewise contains substantial evidence to support a finding that the plaintiff had not demonstrated the necessary deficits in adaptive functioning. First, as the ALJ explained (Tr. 17, 20), the record demonstrates that the plaintiff worked for most of his life as a house painter, a job that the vocational expert testified had a specific vocational preparation level of seven and was skilled work (Tr. 64). The ALJ further noted that the plaintiff did not report problems performing this work prior to his physical injury in 2001 (Tr. 20). While the plaintiff argues (pl. brief at p. 14) that the ALJ placed "undue emphasis" on this one factor to the exclusion of others, the undersigned finds that this was only one factor among others cited by the ALJ to support his step three finding. The plaintiff cites a case from the Eastern District of North Carolina wherein the court noted that the fact that a claimant has worked in the past does not necessarily mean that he does not have deficits in adaptive functioning,. *See Shaw v. Astrue*, No. 08-132, 2009 WL 2486932, at *7 (E.D.N.C. Aug. 13, 2009). However, this district has repeatedly upheld an ALJ's finding that a claimant did not have deficits in adaptive functioning based in part on a past ability to perform semi-skilled or skilled work. *See Weedon v. Astrue*, No. 11-2971-DCN-PJG, 2013 WL 1315311, at *7 (D.S.C. Jan. 31, 2013), *adopted by* 2013 WL 1315206 (D.S.C. Mar. 28, 2013); *Jenkins v. Astrue*, No. 09-1653-JFA-PJG, 2010 WL 3168269, at *5 (D.S.C. Mar. 22, 2010), *adopted by* 2010 WL 3168268 (D.S.C. Aug. 4, 2010). Work history, while it cannot preclude benefits where the Listing 12.05(C) criteria are otherwise met, *Luckey v. U.S. Dep't of Health & Human Servs.*, 890 F.2d 666, 669 (4th Cir. 1989), can be relevant in determining whether a claimant manifested deficits in adaptive functioning prior to age 22. *See Hancock*, 667 F.3d at 475–76 (concluding ALJ's finding that the claimant did not manifest requisite deficits in adaptive functioning was by substantial evidence where the ALJ considered, among many other factors, that the claimant had worked semi-skilled jobs).

Additionally, the ALJ noted that the plaintiff did not demonstrate any deficits in adaptive functioning in his participation in the hearing. The ALJ stated that the plaintiff

participated in the entire hearing; gave intelligent, grammatically correct responses; followed the questioning well; and demonstrated no noticeable cognitive deficit (Tr. 17, 21). *See Chapman v. Colvin*, No. 12-2099-JMC, 2013 WL 3991105, at *11 (D.S.C. Aug. 1, 2013) (upholding a finding of no deficits in adaptive functioning where the ALJ explained, among other factors, that the claimant was able to "testify and respond appropriately to questions asked at the hearing").

Finally, the ALJ further explained that the plaintiff's admissions that he was able to shop for groceries, use money, dress and bathe himself, fold clothes, make his bed, prepare simple meals, and take care of his dog likewise supported the finding that he did not have deficits in adaptive functioning (Tr. 17, 20-21). *See Hancock*, 667 F.3d at 476 (upholding a finding of no deficits in adaptive functioning where the claimant demonstrated, among other factors, the ability to shop, handle change, and perform household chores including cooking); *Chapman*, 2013 WL 3991105, at *11-14 (upholding a finding of no deficits in adapting functioning where the ALJ explained, among other factors, that the claimant demonstrated the ability to maintain grooming and hygiene, performed household chores, and shopped for groceries).

The plaintiff argues (pl. brief at p. 15) that there is no evidence in the record to demonstrate that he performs all the types of activities included in the definition of adaptive functioning, such as driving a car, utilizing public transportation, living alone, using telephones or directories, or using a post office (pl. brief at p. 15 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(C)(1))). As argued by the Commissioner, it was the plaintiff's burden to prove he had deficits in these areas, and the absence of evidence of ability does not constitute evidence of inability (def. brief at p. 8). Moreover, while some contradictory evidence may be found in the record, we are not at liberty to " 'reweigh conflicting evidence ... or substitute our judgment for that of the [ALJ].' " *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). "We must sustain

the ALJ's decision, even if we disagree with it, provided the determination is supported by substantial evidence . . . ." *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996). Here, the undersigned finds that the ALJ's determination that the plaintiff failed to establish deficits in adaptive functioning as required for Listing 12.05(C) is based upon substantial evidence and is free of legal error.

## **CONCLUSION AND RECOMMENDATION**

Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

                                          s/ Kevin F. McDonald
                                          United States Magistrate Judge

July 16, 2014
Greenville, South Carolina